J. FRANK HALEY (Plaintiff), Defendant in Error, v. LUTHER DAVIDSON and C. S. CAMPBELL (Defendants), Plaintiffs in Error.

Springfield Court of Appeals, March 27, 1920.

1. **MINES AND MINERALS: Negotiating Agent Under Duty to Account for Secret Profits in Purchase of Mine.** Where plaintiff mining engineer negotiating for a mine property, which he and defendants were to work as a partnership, purchased the property himself for $9,000 and resold it to defendants, his associates, for $13,500 without disclosure, he must account to defendants for his secret profit of $4,500, though under his operation the mine was profitable and shortly reimbursed defendants.

2. ————: **That Partner Acted as Agent in Purchasing Mine, Which He Sold to Partners at Advance, Admissible.** In suit by a mining partner for an accounting wherein defendant partners counterclaimed for a secret profit secured by plaintiff in originally buying the mining property for himself and reselling it to them at an advance, testimony of a defendant that plaintiff was the agent of defendants in purchasing the mine, *held* admissible.

3. ————: **Misrepresentation by Plaintiff Partner Charged With Having Made Secret Profits Admissible.** In suit by mining partner for accounting wherein defendant partners counterclaimed for a secret profit secured by plaintiff in originally buying mining property for himself and reselling it to them at advance, testimony of a defendant that plaintiff said he paid the seller of the property $13,500, it being admitted he only paid $9,000, *held* admissible to show a misrepresentation as to the facts, to be considered by the court for whatever value it was worth.

Error to Circuit Court of Jasper County.—*Hon. J. D. Perkins*, Judge.

REVERSED AND REMANDED.

*William F. Maher* and *Sheppard & McLaughlin* for plaintiffs in error.

(1) This is an action in equity for an accounting by a partner. It being a suit in equity, it is the duty of this court to look into the evidence and determine from it the rights and liabilities of the parties as to all matters forming the subject of investigation. Dale v. Hogan, 39 Mo. App. 646. (2) This benig a suit in equity for an accounting between partners, the trial court in determining whether or not the defendants were indebted to the plaintiff or the plaintiff indebted to the defendants, should have taken into consideration any secret profits which the plaintiff, as a member of the partnership, might have made through the transaction. 1 Lindley on Partnership, p. 550; Filburn v. Ivers, 92 Mo. 388; Burgess v. Deierling, 113 Mo. App. 383; Pomeroy v. Benton, 57 Mo. 531. (3) A partner has no right to make secret profits by the use of the firm property, or by dealings contrary to the duties which he owes to the partnership, and should be compelled to account for secret profits. Rowley on Partnerships, secs. 652, 653 and 664. (4) If a partner secure a secret commission from a personal dealing with the firm, upon such transaction it will be held for the benefit of the firm, and must account for the whole commission so received. Rowley on Partnerships, section 395; Cross v. Hoffman, 217 S. W. 520.

FARRINGTON, J.—The defendant in error, J Frank Haley, filed a petition in the circuit court of Jasper county against the defendants below, plaintiffs in error here, alleging that a partnership had been formed, and alleging that the defendants had failed to

account to him for his interest therein. A prayer was made for a dissolution of the firm and an accounting to him for his interest therein kept by the defendants. For the purpose of better keeping the issues in mind, we will refer to J. Frank Haley as the plaintiff and to Davidson and Campbell as defendants.

The plaintiff in his suit alleged that in October, 1915, he entered into an agreement with the defendants by which the defendants agreed to purchase a certain mining lease then owned by A. E. Jackson and others doing business as the Fairview Mining Company. The lease covered some land in Newton County, Missouri. It is alleged that it was mutually agreed after the purchase of the lease by the defendants from plaintiff, that plaintiff would undertake to conduct and manage the mining operations for defendants, and that he should have the active charge and management of the same, and that at such time as defendants had received from the profits of said mining operations an amount of money equal to the purchase price of said mine and lease, the plaintiff was to have an undivided one-fifth interest in said mine and lease and all machinery and equipment belonging thereto; and that said partnership was to be known and was known as the Campbell Mining Company. It is alleged that after the purchase of the property he, in accordance with the agreement, which was oral, took charge of the mining operations, managed said property, advanced money to said partnership for expenses, and within a short time there was received from profits of operating the mine, carried on and conducted by plaintiff, enough money to repay the defendants for the full amount of the purchase price, and that thereupon plaintiff was given his one-fifth interest in said mine, lease and equipment and that defendants each retained their undivided two-fifths interest. It is alleged that plaintiff was recognized as a member of the partnership and entitled to the rights of a partner until the month of May or June, 1916, during which time the plaintiff was paid one-fifth of all the

Haley v. Davidson and Campbell.

profits earned by the mine; and that in May or June, 1916, the defendants, without just cause or excuse, removed plaintiff from the management of the mine and notified him that his interest in the concern had ceased. That since that time the defendants had refused to recognize plaintiff as a partner. That they had operated the mine for several months at a profit, and that in September, 1916, the machinery and lease was sold for the sum of $1,000. The prayer of plaintiff was that defendants be compelled to account to him for all profits received by them in the operation and sale of said mine and lease, and that he be given judgment for such sum as shall be found due him and that the firm be dissolved.

The defendants answered, admitting that in October, 1915, they agreed to purchase and did purchase from one Thomas Jackson and associates the property described in plaintiff's petition, and that plaintiff was to have one-fifth of the earnings of said company after the mine was paid for in consideration of his assuming active management of the property, and that the said one-fifth of the earnings was to continue during the period of plaintiff's active management. It was denied that defendants purchased the property from plaintiff. Further answering defendants denied each and every other allegation in the petition. Together with their answer, defendants set up a counterclaim against the plaintiff, stating that plaintiff, at the time he negotiated for the purchase of the property, was the agent of the defendants and purchased said property for them, and that the plaintiff, for the purpose of defrauding these defendants and for his own benefit, represented to defendants that the purchase price of said mine was $13,500, and that was the lowest sum for which the mine could be bought. It is further alleged that the plaintiff in fact purchased the property for the sum of $9,000, and that he by reason of said transaction defrauded the defendants out of $4,500, which he converted to his own use. Judgment was asked on the counterclaim for $4,500.

In November, 1917, the trial court found that plaintiff was and is a member of the partnership, the Campbell Mining Company, and that he was the owner of an undivided one-fifth interest; that C. S. Campbell owned a two-fifths interest and Luther Davidson a two-fifths interest, and that plaintiff was entitled to an accounting from defendants for all moneys earned and expended by said partnership from and after the—— day of June, 1916, up to the sale of said mine, lease and machinery, and that the plaintiff was entitled to an accounting from defendants for all moneys received by them from the sale of said mine, lease and machinery.

The court further found that by agreement of the parties R. H. Davis, Esquire, was appointed referee, to take testimony on the accounting and make and state an account thereon and report the same to the court. It is further recited that the court order that the cause be and the same is continued until the next term of the court for the purpose of taking further testimony on defendants' counterclaim.

At the February, 1918, term of court an application was made for a continuance, setting up the evidence which would be sworn to if certain absent witnesses were present. The record shows that plaintiff admitted that if the absent witnesses were present they would testify to the facts stated in the application. The motion for a continuance was overruled, and at the same term of court it appears that the trial was resumed, and after hearing the balance of the testimony on the counterclaim the cause was continued until the next regular term of court on account of the referee not having reported on the accounting.

At the January term, 1919, the referee filed his report, and at the same term the court rendered a decree sustaining the report of the referee except in two items, found that the defendants were justly indebted to plaintiff in the sum of $513.12, and that the plaintiff was entitled to recover that amount from the defendants as his debt, and damage. The court further found the

issues in favor of plaintiff on defendants' counterclaim, dissolved the partnership and dismissed defendants' counterclaim.

From the evidence it appears that the plaintiff was a mining expert, living in Joplin, Missouri, and that defendants were Kansas City business men who had been and were interested in various mining ventures. That in October, 1915, there was a mine known as the Fairview Mining Company, which is referred to in the testimony and which we will refer to as the Jackson mine, being operated in Newton·County, Missouri. The plaintiff knew the property and had great faith in its being a paying proposition. Sometime prior to October, he had been given a price on this mine of $4,000, but the mine had shown improvement and he was afterwards, as he says, given the price to sell the mine for Jackson for $8,000, he to receive a commission thereon of 10% from the Jackson people. Jackson, when placed on the stand, denied that plaintiff ever had the mine to sell as an agent but does say that he had given him an option on the mine for $8,000. It appears that the plaintiff had been connected with other mining ventures in which one of the defendants had been interested, and that defendants had been interested, and that defendant, Luther Davidson, had requested that plaintiff operate the mine in case it was purchased. The testimony is clear that the plaintiff, through his own endeavors and another agent connected with him in Kansas City, interested the two defendants in this proposition and stated that it could be purchased for $8,000. Nothing was done at that time, but later the plaintiff informed the defendants that the mine was a good paying proposition and that it could be purchased for $13,500. Defendants testified positively that on the day before the mine was purchased by them for $13,500, the plaintiff was in Kansas City and told them that was the lowest amount it could be had for. The plaintiff is not positive whether he was in Kansas City on the day prior to the purchase of the mine or not. At any rate, the evidence is clear

that during negotiations in Kansas City with these two defendants the title to the property was represented by plaintiff to be in the Jackson people, and in fact the title was in the Jackson people when he made such representation. In any event, on or about October 27, 1915, the two defendants procured a loan from their banker in Kansas City for $13,500, took three drafts, one for $12,000, one for $1,000 and one for $500, and sent these drafts by Bob Davidson, a brother of Luther Davidson, to Joplin. Bob Davidson testified that he went to Joplin on the same train with the plaintiff; the plaintiff denies this. In any event, he did go to Joplin, got in communication with Haley, which resulted in him, on the morning of the day after he arrived in Joplin, turning over to the plaintiff the drafts aggregating $13,500 and receiving therefor an assignment of the lease from the Jackson people to the plaintiff and an assignment from the plaintiff to the defendants. It is admitted by all parties that on the day Davidson was in Joplin, that late that day, about supper time or thereafter, the plaintiff purchased this mining plant from Jackson, giving his personal check for $9,000. On the next day he then in turn turned it over together with his assignment to the defendants for $13,500, making a clear profit of $4,500 on the deal. The evidence is uncontradicted that he took charkeof the mining operations for the defendants, successfully conducted the same, and within six or seven weeks produced enough to repay the defendants their original investment of $13,500, and from then until defendants discharged him as manager he received his one-fifth on the proceeds for his services and interest in the association.

We have no difficulty in sustaining that part of the court's decree adjudging the plaintiff as an owner of a one-fifth interest in a partnership composed of himself and the two defendants, and that the amount arrived at and adjudged to him which came to the partnership after his discharge is correct. And we further can agree that the court was correct in holding that a

partnership existed which entitled plaintiff not only to an interest in the profits of the mining operation but to a one-fifth interest in the machinery, property and equipment. We, however, cannot agree with the decree, as the record is presented to us, so far as it dismisses and leaves out of account the claim made by the defendants on their counterclaim. The evidence clearly shows that the plaintiff, through his former dealings with Davidson, inspired his confidence as a mining expert; that he was desirous of having the two defendants purchase this mine, and that as a result thereof he would acquire a substantial interest in the proposition. Whether at the inception of his negotiations with them he was a partner or an agent is of no concern in the final solution of this case. He, at least, was undertaking to engage with them in a joint enterprise in which the defendants would put up the purchase price necessary to acquire the property, and he would acquire an interest in that property after it had been purchased to compensate him for the sale of it to them, and his time and ability in operating the mine after they got it. The relation, therefore, by the very negotiations that he was carrying on with them, created one of confidence, and a relation which, whether that of agency, partnership or joint ownership, must necessarily create a relation other than one termed in the law as dealing at arm's length. There is no question but what he represented to these parties, very shortly before they purchased it, that the property belonged to Jackson, and in such representation he was telling them the truth. There is no showing that he ever conveyed to either of the defendants at the time they parted with their money to him for the purchase of the mine that it no longer belonged to Jackson but in fact belonged to him. He makes the following admission in his testimony: "I have no recollection of seeing Davidson the day before these checks were turned over to me. About two weeks before that, at the time the property was put up to them at eight thousand dollars, I saw Mr. Luther Davidson,

206 M. A.—8

and he told me that they would take the mine if I could buy it right, and I told him I would come back and get Jackson and his people together and see if I couldn't buy it cheaper.''

''That was not in connection with Campbell at all. I do not remember that Mr. Davidson and I were there and talked about his deal with the Campbells, The only knowledge I have of the Campbells was when Sutherland called me up and told me about some people he had.''

''I don't believe I was in Kansas City the day before the deal was made. I have no recollection of it. At the time the property was sold for $13,500 I did not tell Mr. Luther Davidson that I would come on down to Joplin and get Jackson and his associates together and see if I couldn't buy the mine for less than $13,500. I have no recollection of it at all.''

By this testimony he admits that two weeks before he sold it to them for $13,500, he had offered it to them as the property of Jackson for $8,000, and that he had agreed with Davidson that he would go home and see if he could not buy it cheaper. It is admitted that he did not buy the property from Jackson until the night before he made his assignment to these defendants, and it is admitted that he gave Jackson $9,000 for the property.

The law is well settled that where parties contemplate future business relations, growing out of a sale of property, the price paid for the property is a material factor. [See 12 R. C. L., under Chapter of Fraud and Deceit, sec. 49, page 285.] And if one induces another to join with him in the purchase of land, and by falsely representing the amount of the price induces him to put up more than his share and keeps the balance, he is guilty of actionable fraud. [See 12 R. C. L., sec. 50.]

It is laid down in 20 R. C. L., under Partnership, sec. 91, page 875, that the duty of good faith exists between persons who are about to become partners, and that they cannot deceive their associates by conceal-

ment of material facts since each is the confidential agent of the other and has a right to know all that the others know, and each is required to make full disclosure of all material facts within his knowledge in any way relating to the partnership affairs.

In plaintiff's petition he charges that a partnership grew out of the purchase of this property, and he nowhere contends, so far as this record is concerned, that he ever disclosed to his associates, with whom he was about to enter into partnership arrangement, that he personally was buying this property from Jackson, the party that he had represented to them owned the property, for $9,000, and was selling it to them for $4,500 more than he paid for it.

It could hardly be denied, under the facts as shown in this record that the moving cause that made plaintiff pay Jackson $9,000 for this property on the night before he transferred it to these defendants, was that he knew defendants had sent their drafts for $13,500 to Joplin to be turned over for the purchase of the mine provided it could not be had for any less sum, and he himself, by the admissions heretofore related, acknowledged that he had told Luther Davidson, one of the defendants here, that he would go home and see if this property could not be purchased from Jackson for a sum less than $8,000.

In Lindley on Partnership, Vol. 1, page 511, it is declared:

"This obligation of perfect fairness and good faith is, moreover, not confined to persons who actually are partners. It extends to persons negotiating for a partnership, but between whom no partnership as yet exists."

We also quote from page 514, same author, as follows:

"Good faith requires that a partner shall not obtain any private advantage at the expense of the firm. He is bound in all transactions affecting the partnership, to do his best for the common body, and to share with the co-partners any benefits which he may have

been able to obtain from other people, and in which the firm is in honor and in conscience entitled to participate.''

Rowley on Partnership, Vol. 2, sec. 653, page 882, declares, in discussing the good faith required, as follows: ''Nor is this requirement confined to persons who are actually co-partners, but it extends to those negotiating for a partnership not yet formed.''

The expression of these two authors is supported by the great weight of authority, as is shown by a note contained in 35 L. R. A. (New Series), pages 177 to 186.

The evidence clearly shows that the plaintiff was suggesting to the defendants that Jackson and his associates were not in full accord, and that if a purchase was made it would have to be done at once.

Some stress is laid on the fact that the mine paid out and that defendants shortly recovered their purchase money. This is no reason why the plaintiff should not account to them for profits, if he bore a confidential relation to them. It is held in Bergeron v. Miles, 88 Wis. 397, 43 Amer. State Rep. 911, ''If one party induces another to join with him in the purchase of land, each to pay one-half of the purchase price, which the former falsely represents to be greater than it really is, and the latter gives the former one-half of such excess price to be used in paying for his share, and the former pays for the land with a smaller amount, keeping the remainder himself, the deceit is actionable and the latter may recover the amount paid in excess of his share of the actual price, though the land is worth the price represented.'' [See, also, McLain v. Parker, 229 Mo. 68, 129 S. W. 500.]

If the trier of the fact should find in this case that the plaintiff induced the defendants to pay $13,500 for the property, with the understanding that he would become a partner with them as soon as the property was purchased, and was telling them that the property belonged to Jackson and that was what it would cost to purchase it, it was then his duty before he could make a

Haley v. Davidson and Campbell.

profit of $4,500 off of them in the purchase price they were paying, to have disclosed to them that the property could be purchased from Jackson for $9,000, and that he himself, growing out of these negotiations leading up to their payment of $13,500, was making a profit personally of $4,500.

We are inclined to think that the trial court tried the defendants' counterclaim on a theory narrower than the law permits, as during the course of the trial the court remarks: ''I want to determine whether or not he owned the mine at the time he sold it to you people or whether he sold it before he got it. I would have to know that before I could pass on whether or not he was entitled to anything or not. Anything that would tend to show he did not own the mine at the time he sold it. I will hear that.''

We are further inclined to believe that the court was treating the question of agency set up in the counterclaim as one of a mine broker or real estate broker, who was employed to buy or sell. It is true, there is no evidence that the defendants actually hired the plaintiff to purchase land for them as their agent in the narrow sense, but there is evidence tending to show as heretofore pointed out, that there was the broad ground of agency formed by the relation of co-purchasers of property or those contemplating entering into a partnership that would require the plaintiff to account for undisclosed profits made in his dealings with defendants, the same as had he been actually hired as agent to purchase for them.

The evidence also discloses that a settlement was made between these parties in May or June, 1916, when the plaintiff turned the books of the company over to the defendants. The extene and character of the settlement made is not gone into.

The court excluded the offer to show by witness W. F. Campbell that Haley was the agent of the defendants in purchasing the mine from Jackson. While it is true, he had given testimony in the case prior to

this offer showing that he was not at all familar with the dealings in October, 1915, when the mine was purchased, yet that goes to his credibility and the evidence was competent. And in addition to this, it was offered to be shown by him that Haley told him and the defendant that he actually paid Jackson $13,500 for the mine. It is admitted by all parties that he only paid $9,000 to Jackson, and the statement that he paid $13,500 to Jackson for the mine, if Haley made such a statement at all, is untrue and would be competent to show a misrepresentation of the facts concerning the purchase of the mine from Jackson. This evidence should be admitted, to be considered by the court for whatever value it is worth as to credibility.

We, therefore, do not feel called upon to pass final judgment on this case on the present record, and believe that with the suggestions made concerning the law governing such transactions, it would be in the interest of justice that the case be retried in the light of the law as herein declared and cited. The judgment will therefore, be reversed and the cause remanded.

*Sturgis, P. J.,* and *Bradley, J.,* concur.